# EXHIBIT 1

Sean Bennett, 7/24/2025

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

```
SEAN BENNETT, an individual,     )
                                 )
        Plaintiff,               )
                                 )
        vs.                      )   Case No.
                                 )   2:23-cv-02425-
City of Phoenix, a governmental  )   ROS--DMF
entity; American Airlines, Inc.,)
a foreign corporation; Officer   )
Joel Cottrell and Jane Doe       )
Cottrell, a married couple;      )
Officer Benjamin Denham and Jane )
Doe Denham, a married couple;    )
Officer Todd Blanc and Jane Doe  )
Blanc, a married couple; Officer )
Peru and Jane Doe Peru, a        )
married couple; Sergeant Hogan   )
and Jane Doe Hogan, a married    )
couple;                          )
                                 )
        Defendants.              )
_____)
```

**THE VIDEOTAPED DEPOSITION OF:**

**SEAN BENNETT**

**THURSDAY, JULY 24, 2025**

**ZOOM VIDEO CONFERENCE, CALIFORNIA**

Reported by:
Denise Talancon
CSR No. 14047

Peterson Reporting Video & Litigation Services

```
 1
 2            UNITED STATES DISTRICT COURT
 3             FOR THE DISTRICT OF ARIZONA
 4
 5   SEAN BENNETT, an individual,   )
                                    )
 6        Plaintiff,                )
                                    )
 7        vs.                       ) Case No.
                                    ) 2:23-cv-02425-
 8   City of Phoenix, a governmental) ROS--DMF
     entity; American Airlines, Inc.,)
 9   a foreign corporation; Officer )
     Joel Cottrell and Jane Doe     )
10   Cottrell, a married couple;    )
     Officer Benjamin Denham and Jane)
11   Doe Denham, a married couple;  )
     Officer Todd Blanc and Jane Doe)
12   Blanc, a married couple; Officer)
     Peru and Jane Doe Peru, a      )
13   married couple; Sergeant Hogan )
     and Jane Doe Hogan, a married  )
14   couple;                        )
                                    )
15        Defendants.               )
     _____)
16
17
18
19        The videotaped deposition of Sean Bennett,
20   taken on behalf of the Defendants, before Denise
21   Talancon, Certified Shorthand Reporter No. 14047, for the
22   State of California, commencing at 9:59 a.m., Thursday,
23   July 24, 2025, via Zoom Video Conference in the State of
24   California.
25
                                                    2
```

```
 1   APPEARANCES OF COUNSEL:
 2      For the Defendant, American Airlines, Inc.:
 3      WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
        BY:  PATRICK J. KEARNS, ESQ.
 4      2231 EAST CAMELBACK ROAD, SUITE 200
        PHOENIX, ARIZONA 85016
 5      480-562-3660
        PATRICK.KEARNS@WILSONELSER.COM
 6
 7
 8      For the Plaintiff:
 9      MILLS + WOODS LAW, PLLC
        BY:  SEAN A. WOODS, ESQ.
10      5055 NORTH 12TH STREET, SUITE 101
        PHOENIX, ARIZONA 85014
11      480-999-4556
        SWOODS@MILLSANDWOODS.COM
12
13
14   ALSO PRESENT:
15      DAVID WRIGHT, VIDEOGRAPHER
16      MONICA BENNETT
17
18
19
20
21
22
23
24
25
                                                    3
```

```
 1                     I N D E X
 2   EXAMINATION                              PAGE
 3   BY:  MR. KEARNS                             6
 4   BY:  MR. WOODS                            140
 5                     E X H I B I T S
 6   DEFENDANT'S                              PAGE
 7   1 - NOTICE OF DEPOSITION                   12
 8   2 - ALASKA AIRLINES FLIGHT CONFIRMATION CODE: CCONRL  23
 9   3 - AMERICAN AIRLINES EMPLOYEES' INCIDENT STATEMENTS  34
10   4 - VIDEO                                  46
11   5 - E-MAIL FROM WILLIAM COOLEY             63
12   6 - PHOENIX POLICE DEPARTMENT INCIDENT REPORT  71
13   7 - SCREENSHOT OF PERMANENT SUSPENSION     85
14   8 - E-MAIL FROM TSA.DHS.GOV                88
15   9 - E-MAIL FROM COLLEEN MURKOWSKI          92
16   10 - CORRESPONDENCE TO OFFICE OF U.S. SENATOR LISA  101
17        MURKOWSKI
18   11 - BOOMPLAY PODCAST                     109
19   12 - E-MAIL FROM ROSANNE BENNETT          114
20
21              INFORMATION REQUESTED
22         PAGE   LINE
23         (NONE)
24   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
25         (NONE)
                                                    4
```

```
 1                  THURSDAY, JULY 24, 2025
 2                Zoom Video Conference, California
 3                  9:59 A.M. - 2:14 P.M.
 4                        *  *  *  *
 5                      EXAMINATION
 6       THE VIDEOGRAPHER:  Good morning.  Time on the
 7   record is 9:59, pacific daylight time, a.m.  Today's date
 8   is July 24th, 2025.  My name is David Wright, contracted
 9   by Peterson Reporting Video and Litigation Services.  The
10   court reporter today is Denise Talancon of Peterson
11   Reporting, located at 530 B Street, Suite 350, San Diego,
12   California 92101.
13       This begins the video deposition of Sean
14   Bennett, testifying in the matter of Sean Bennett versus
15   City of Phoenix, et al, in the United States District
16   Court for the District of Arizona, case number
17   223CV02425ROSDMF, taken remotely via Zoom.
18       The video and audio recordings will take place
19   at all times during this deposition, unless all counsel
20   agree to go off the record.  The beginning and end of
21   each media will be announced.
22       Will counsel please identify yourselves and
23   state whom you represent?
24       MR. KEARNS:  My name is Patrick Kearns of Wilson
25   Elser.  I represent American Airlines.
                                                    5
```

Sean Bennett, 7/24/2025

1  MR. WOODS: My name is Sean Woods of Mills and
2  Woods Law. I represent the plaintiff, Sean Bennett.
3  THE VIDEOGRAPHER: The court reporter may now
4  introduce herself and swear in the witness.
5  THE REPORTER: I'm Denise Talancon, court
6  reporter 14047.
7  -oOo-
8  SEAN BENNETT,
9  was called as a witness, and having been first duly sworn
10 by the Certified Shorthand Reporter, was examined and
11 testified as follows:
12 THE VIDEOGRAPHER: Counsel may now proceed.
13 MR. KEARNS: Thank you, everyone.
14 EXAMINATION
15 BY MR. KEARNS:
16 Q. Good morning, Mr. Bennett.
17 A. Good morning, sir.
18 Q. Are you able to hear me okay?
19 A. Yes, sir.
20 Q. Okay. Thank you.
21 I can hear you pretty well at the moment, but
22 it's a little soft. There may be a moment where you have
23 to lean in or something like that, but for the moment
24 it's okay.
25 A. Okay, sir.

6

1  Q. Mr. Bennett, have you ever had your deposition
2  taken before?
3  A. Yes, I have, sir.
4  Q. Okay. And what context?
5  A. Federal with Iranian court case with the United
6  States of America as a soldier.
7  Q. Okay, okay. And how long ago was that,
8  approximately?
9  I mean, what, you know, 10 years, 15 years?
10 A. Last time was probably four months ago.
11 Q. Four months ago. Okay.
12 And are these -- are these federal lawsuits?
13 Are they investigations that -- that you would
14 give your deposition for?
15 A. I was the -- I was the platoon sergeant in
16 Karbala, Iraq, in an embassy that was Iranian, so, I
17 mean, they -- they -- they were doing a court case
18 against the Iranians.
19 Q. Okay. Okay. Since I'm not entirely familiar
20 with that procedure or that process, I'm just going to
21 run over the rules for a civil deposition just so we're
22 on the same page; okay?
23 And you may have heard some of this from your
24 attorney already or you may be familiar with it from your
25 prior deposition experience.

7

1  Well, let me ask you really quick.
2  Have -- have you ever given your deposition
3  other than that instance or other than in that case?
4  A. No, sir.
5  Q. Okay. So this is your first sort of civilian
6  deposition?
7  A. To the best of my recollection, yes, sir.
8  Q. Okay. Great. Thank you.
9  So I'll just quickly run over the rules. The
10 oath you just took by the court reporter means that your
11 testimony today is that -- is just the same as it would
12 be in a court of law; right?
13 Your testimony is given today under the penalty
14 of perjury and despite the fact that we're on a Zoom and
15 we're in relatively comfortable surroundings, your
16 testimony would have the same force and effect as it
17 would in a court of law.
18 Do you understand that?
19 A. Yes, sir.
20 Q. Okay. Thank you.
21 At the conclusion of the deposition and sometime
22 down the line, it will be transcribed into sort of
23 booklet form. That's really these days it's a PDF, and
24 it will be provided to you for your review; okay?
25 On that note, however, although we are recording

8

1  this deposition on video, the court reporter who is here
2  is taking down every word that's being said on the video.
3  It makes it very difficult for her if we end up talking
4  over each other or if the audio or the audible response
5  is something like uh-huh or uh-uh, something along those
6  lines. It's very difficult to record the actual
7  response.
8  That means there may be a circumstance during
9  this deposition where I have to ask you was that a yes;
10 was that a no. Something along those lines. I -- I
11 won't -- my intention is not to be rude. It's just to
12 get a clear transcript.
13 Is that fair enough?
14 A. Yes, sir.
15 Q. Okay. As we proceed today if my question
16 doesn't make sense or if for some reason you don't
17 understand it, just let me know that, okay, and I will
18 try and reask the question in a way that does make sense.
19 If you don't know the answer to a question, if
20 it would be a pure guess, let me know that, as well. I
21 don't want you to guess here today, and I'll either move
22 on or I'll ask a different question.
23 If you have an estimate, if it wouldn't be a
24 complete guess, but you have some kind of estimate, I am
25 entitled to that response.

9

Sean Bennett, 7/24/2025

|  |  |
|---|---|
| 1  about what part of the statement you're talking about? | 1  uniform walked up to me and pointed across the aisle, and |
| 2      MR. KEARNS:  Sure, sure.  I'm sorry.  That's a | 2  I started pulling my ticket out.  She turned around and |
| 3  good point.  Tell you there's a statement here, and I can | 3  left, and then a lady wearing American Airlines gear came |
| 4  reference it. | 4  up to me yelling, saying she was deboarding the whole |
| 5      It's -- for the record, it's in a packet that is | 5  plane. |
| 6  produced American Airlines number -- Bates number 45 | 6      Everybody was upset.  Everyone around me they |
| 7  through -- I apologize here.  Hold on -- 45 through 59. | 7  started screaming at me to get off the damn plane, |
| 8  It's the -- it's the crew statements, and I'm referencing | 8  cussing me out.  Get off the plane, get off the plane. |
| 9  Page No. 2. | 9      So I secured my bag.  One of the -- a soldier |
| 10     For some reason I think I grabbed a copy that | 10 that was sitting in the back, he came around and helped |
| 11 didn't have the actual Bates put on it, but it's 49. | 11 me get around the flight attendant because she was |
| 12 It's Page 2, and that would make it Page 46.  And I'll | 12 physically not going to let me get around her, so I |
| 13 share it.  I'm sorry.  40 -- going the wrong way. | 13 managed to get around her and get off of the plane as |
| 14     And it appears the captain here states on this | 14 they were yelling they were going to deboard the whole |
| 15 document, sir, that the event started before boarding | 15 plane, so I felt like I was getting myself out of chaos |
| 16 when the passenger approached the first officer in the | 16 at that point. |
| 17 boarding area and asked if he was flying the flight to | 17 Q.  Okay.  Did they deboard the whole plane? |
| 18 Anchorage.  The FO, or first officer, engaged the | 18 A.  No, they did not. |
| 19 customer and responded, yes, I am.  The customer then | 19 Q.  Okay.  So how -- how did that start? |
| 20 began to -- then began to make remarks about his large | 20     I -- why -- in -- in your mind why was that |
| 21 net worth and how we would have to take care of him. | 21 happening? |
| 22     Does that ring any bells to you, sir? | 22 A.  Sir, your guess is as good as mine.  I mean, I |
| 23     Do you have any recollection of that? | 23 -- I have lots of questions, too.  That's why we're |
| 24 A.  I don't have a large net worth, and we all had | 24 sitting here. |
| 25 our masks on to begin with, so I wouldn't have been | 25 Q.  The captain -- and I'll -- I'll represent to |
| 30 | 32 |

|  |  |
|---|---|
| 1  having a conversation with the pilot and the FO.  I was | 1  you -- and we can take a look at it, if you want -- but |
| 2  just trying to get to my seat. | 2  the captain and the flight crew indicated various things, |
| 3  Q.  Okay. | 3  one of which is that you were not being compliant with |
| 4  A.  I just -- I'm on two legs already, so, I mean, | 4  wearing your mask? |
| 5  that -- no, I didn't make that statement. | 5      (Simultaneous crosstalk.) |
| 6  Q.  Okay.  The captain's -- and I'll just keep it up | 6      THE WITNESS:  I had my mask on probably up to |
| 7  for a second here. | 7  the point where I was trying to get off the airplane with |
| 8      The captain -- the captain's statement here on | 8  my headphones that I lost, a bunch of paperwork that's |
| 9  Bates stamped Page 46, this paragraph indicates that the | 9  probably sitting on the plane still that I lost.  I had |
| 10 customer boarded last and there were some comments made | 10 my wallet, my phone, and my mask in my bag on my back. |
| 11 to the flight attendants that I didn't understand and | 11 They told me to get off of an American Airlines plane, |
| 12 then that you did not take your assigned seat. | 12 and I left as fast as I could. |
| 13     Do you recall that? | 13     I don't know if you've ever had to do that, but |
| 14 A.  I do not recall boarding last and not taking my | 14 you -- you make a business decision.  Get off the plane, |
| 15 assigned seat. | 15 and that's what I did. |
| 16 Q.  Okay. | 16 BY MR. KEARNS: |
| 17 A.  I was back in the plane.  There were people | 17 Q.  Would you describe your conduct getting off the |
| 18 loading on that plane when I was trying to get off of | 18 explain as being disruptive? |
| 19 that plane still. | 19 A.  I would explain it getting off the plane as fast |
| 20 Q.  Okay. | 20 as I could, just getting -- I mean, trying to get off. |
| 21 A.  So the timeline doesn't even match with what | 21 There were people still boarding that plane.  They said I |
| 22 you're saying. | 22 was the last one on the plane.  Mathematically, that |
| 23 Q.  Do you recall the flight attendant moving you to | 23 doesn't make sense. |
| 24 another seat? | 24 Q.  Were you yelling? |
| 25 A.  The flight attendant that was not wearing any | 25 A.  As I got off the plane I said, "My name's |
| 31 | 33 |

```
1   retired Master Sergeant Sean Bennett. I got a silver
2   star and a purple heart," and I said, "No, I'm not
3   drunk," because some lady was screaming at me, holding
4   her phone up talking about he's probably drunk and la la.
5   I mean, I was being yelled all of the way through the
6   plane to get off before I got my ass beat and everything
7   else. It was a five and a half hour flight. They were
8   not happy. 130 plus people were mad.
9       Q.  Did you announce at any time in a manner that
10  other people would hear you that you had killed people
11  before?
12      A.  I would tell you that I probably said some
13  things that day trying to get off that plane just trying
14  to get off that plane, but I don't think I said that I
15  killed anybody. Probably said something about Iranians.
16      Q.  Sir, one of the flight crew -- I'll show you.
17          MR. KEARNS: This is page -- for the record,
18  this is Page 5 of the PDF.
19          MR. WOODS: Patrick, can I ask that we name the
20  person that's making the statement, too?
21          MR. KEARNS: Sure. And I'll go ahead and mark
22  this as Exhibit 3 so we can reference it that way.
23          (Deposition Exhibit 3 was marked for
24  identification by the court reporter.)
25  //
```

34

```
1   BY MR. KEARNS:
2       Q.  So I'm on Page 5 of the PDF. This is a
3   statement by Annette Edmonds Hodge. I think I have that
4   right. It's -- yeah, Annette Edmonds Hodge.
5           And Ms. Hodge indicates that as you were
6   boarding you were reminded to wear your mask, that there
7   was a CRO requested to the aircraft due to an unruly
8   passenger not wanting to follow instructions and not
9   wearing the mask and yelling, "I have killed people
10  before."
11          Do you recall these interactions at all, sir?
12          I mean, now that you are reviewing some of these
13  statements, do you recall not wearing your mask or being
14  unruly or yelling that you had killed people before?
15      A.  No, and I had been on lots of flights on.
16  Hundreds. And I been on flights with COVID rules, too,
17  and I had my mask on. That seemed like a sticking point
18  for anybody at this, but I had my mask on.
19          Killing people? I just can't recall saying
20  that. That just doesn't stick out in my mind as
21  something that I'm just going to announce.
22          And Annette. Annette's got a lot of statements
23  there as you continue reading that are going to get a
24  little bit strange.
25      Q.  Okay. She mentions, for example, that another
```

35

```
1   military passenger got up and started guiding him off the
2   aircraft.
3           Do you recall that?
4       A.  That definitely happened. Him and I sat out
5   there and talked and we were boarding on the plane and
6   chit chatting. He was going up to a funeral in Fort
7   Wainwright up in Fairbanks, so, yes, him and I spoke.
8   And when he saw what was going on because everybody in
9   the back of that plane was starting to scream bloody
10  murder about the whole plane deboarding, so he walked up.
11  Like I was going to put my bag on when he got around to
12  me. I was glad he came over there. She was not going to
13  let me get around her, the stewardess wearing her
14  uniform.
15      Q.  And what do you mean she wasn't going to let me
16  get around her?
17          Wasn't she asking you to leave the plane?
18      A.  She was standing in my way yelling at me. This
19  was not your normal, hey, sir, we need you to get off the
20  plane. She had walked half way up the plane screaming at
21  me. The whole plane knew what was going on. I heard her
22  walking up. Well, if he's not going to -- get him out.
23  If he's not changing his seat, he's leaving. I'm
24  deboarding the whole plane. So that was -- they had
25  chaos going on in that joker, and I just decided to take
```

36

```
1   myself out of the chaos.
2       Q.  Is it your testimony, sir, that there was --
3   there was no event that preceded this, that the flight
4   attendants just came up to you and said get off the
5   plane?
6       A.  One young lady walked up to me, not wearing a
7   American Airlines uniform whatsoever, and pointed at a
8   seat across the aisle from me and said, "Move." I was
9   reaching in my pocket to pull out my ticket with my wife
10  on the phone, trying to, you know, get just get settled
11  into a flight. It's a long freight. I've taken it fifty
12  times, probably. I mean, y'all have my records.
13          So, I mean, no, nothing. Nothing that indicated
14  that I had any problems at all. I got on that plane and
15  got seated down just like a good little kid would.
16          The second employee came screaming and yelling
17  wearing -- I could see the little emblem on her cardigan
18  or her little sweater she had on, and she would not
19  allow -- I mean, we had to get real small and get around
20  her in that emergency aisle. That's the only reason why
21  I was able to get out because it was the emergency aisle.
22  It's the Row 27 on that plane. It's got the five seats,
23  the three seats, and the jumper seats where the crew and
24  the deadheads normally sit at.
25      Q.  Yeah. Another flight attendant issued a -- a
```

37

Sean Bennett, 7/24/2025

## Page 38

1 statement. I'll show you this. This is Page 8 of the
2 PDF. This is crew Audrey Weishaar, crew member, stating
3 that you boarded not wearing a mask and that you were
4 making loud, inappropriate comments to flight attendants
5 and make grandiose gestures.
6     Do you recall any of that?
7   A. I do not. And so the pilot has me stopping and
8 talking to him. We all have our masks on apparently
9 because I didn't hear I didn't have a mask on in that
10 statement, but now I have a flight attendant saying I'm
11 not wearing it as I'm boarding. I mean, we -- come on.
12 Do I have a mask on or not? I had a mask on. I actually
13 had a mask in the police car that was in my pocket. I
14 knew I had a mask.
15   Q. Well, I'll tell you that the -- I mean, so far
16 the flight attendants and the -- all of them are -- all
17 of these statements are pretty consistent that they
18 indicate that there's an issue with you wearing your
19 mask. It's mentioned in each one.
20     The captain is talking about an interaction with
21 the first officer before boarding, but then the captain
22 indicates that -- that he had been informed, I guess,
23 that you were not complying with your mask. And then the
24 next -- well, I'll just represent to you, sir, that all
25 of the flight crew make that comment.

## Page 39

1     It's your testimony that they're all incorrect?
2   A. My testimony is that I had a mask on walking on
3 that airplane and trying to leave the airplane, too, in
4 the middle of all that. My mask could have came off
5 exiting the aircraft. I know it came off when the cops
6 jumped me because, you know, all of the flight attendants
7 said I was beating people up.
8   Q. Well, I don't know if they say you're beating
9 people up, but Audrey Weishaar here, she mentions
10 again -- she says the incident escalated where you stood
11 up and shouted at everybody how special he was. This is
12 her quote. As a sergeant in Iran, you had killed
13 important people to protect our freedom and mentions
14 former President Bush had awarded you medals.
15     And you stated that you -- they couldn't remove
16 you from the flight and continued on about killing
17 people.
18     Do you see that portion?
19   A. I'm -- I'm listening to what you're saying. So
20 they're telling me that I'm saying that they can't remove
21 me from a flight as I'm trying to leave the plane? I
22 mean, this happened so fast. I'm going to deboard the
23 plane. People screaming. I get up, put a bag on, and
24 leave the plane. Leave the plane. I was in the back of
25 the plane. I had to get all of the way to the front

## Page 40

1 around the American Airlines associate that's standing
2 there in my way, and then I get off the plane.
3   Q. Sir, does reviewing this statement from a flight
4 attendant give you anymore recollection of whether or not
5 you were yelling about having killed people on the
6 flight?
7   A. No, it does not. After four years I don't
8 remember saying that.
9   Q. Okay. Do you recall talking to a flight
10 attendant about being a sergeant in Iran and the medal
11 you received from former President Bush?
12     I'm just --
13   A. No, I don't --
14     (Simultaneous crosstalk.)
15 BY MR. KEARNS:
16   Q. How would she know that?
17     How would she know that information?
18   A. As I walked off that plane I said, "My name is
19 retired Master Sergeant Sean Bennett." I don't know.
20 Pull me up on Facebook. I didn't -- we didn't -- I did
21 not sit down and have a conversation with the flight
22 attendant about my ERB and my medical records and my
23 military records. This is just -- I mean, I wasn't
24 dating any of them.
25   Q. Were you yelling obscenities at any time, any

## Page 41

1 kind of swear words?
2   A. No. Like I don't remember cussing anybody out.
3 I wasn't being -- I wasn't trying to get into a
4 altercation physically with anybody, and that normally
5 starts that when you start cussing people out, especially
6 since I was trying to leave the plane.
7   Q. The flight attendant acknowledges that you
8 didn't specifically threaten anyone, but that you seemed
9 to frighten a lot of passengers with your rant, which was
10 very loud and full of obscenities.
11     Do you disagree with that statement?
12     Do you -- do you claim that that isn't accurate?
13   A. I disagree with everything at this point that
14 you say except me trying to get off the plane.
15   Q. Okay. Had you been drinking?
16   A. I had one beer on the flight from Chicago
17 because I was in first class, and I think I had a
18 Heineken. And I had a little bit of food on that flight,
19 too.
20   Q. Sir, do you recall any incident where you were
21 making comments to people or something about their food
22 or attempting to steal their food?
23   A. No. I'm not a big foodie, boss. I -- I just --
24 that one, when I read that I kind of laughed at that,
25 too. Trying to steal their food. That doesn't even

```
 1   process in my mind.
 2       Q.  This report on Page 13 indicates that you had
 3   already had a verbal altercation with the first officer
 4   prior to boarding and that this individual -- maybe this
 5   says Audrey, so maybe I misnamed the last one.
 6       But it says she first noticed you during
 7   boarding when you were yelling at another passenger about
 8   his food and that you threatened to steal it and that you
 9   took off your mask and yelled that his seat had been
10   moved from 27C to 27D and notes that your actual seat was
11   27B.
12       Does that refresh your recollection at all about
13   the circumstances?
14       A.  That does not whatsoever.
15       Q.  Okay.
16       A.  That didn't -- I was fighting about food?  You
17   got me fighting about food now.  You got me with no mask
18   on.  Nobody -- everybody -- I mean, you got me fighting
19   with everybody, and now I'm fighting about food.
20       Q.  It indicates that you had a dip bottle for
21   tobacco.
22       Were you chewing tobacco?
23       A.  It's been four years.  I can't remember, if I
24   was or was not, honestly.
25       Q.  Okay.  Did you occasionally chew tobacco in
```

42

```
 1   2021?
 2       A.  Oh, yeah.  There's probably a can in my back
 3   pocket that looks like everybody's else's can that
 4   dipped, so we're -- now we're saying I'm smoking a
 5   cigarette, too, I bet.
 6       Q.  This statement says you had a dip bottle for
 7   your tobacco and you told the flight attendant that you
 8   could throw it away and that she did?
 9       A.  I --
10       Q.  Do you dispute that?
11       A.  I don't remember that at all, and I've flown
12   hundreds of flights.
13       (Simultaneous crosstalk.)
14   BY MR. KEARNS:
15       Q.  You're aware that you're not allowed to chew
16   tobacco on a flight?
17       A.  Hundreds of flights and I can never remember
18   handing anybody a spit bottle and saying throw this away
19   for me.  That's not my couth.
20       Q.  You're aware that you're not allowed to chew
21   tobacco on a flight --
22       (Simultaneous crosstalk.)
23   BY MR. KEARNS:
24       Q.  -- federal regulation?
25       Yeah.
```

43

```
 1       A.  I'm allowed to have a can of tobacco in my back
 2   pocket though.
 3       Q.  This flight attendant also indicates that
 4   someone had come over and advised you to put on your
 5   mask?
 6       A.  I don't remember that either.
 7       Q.  Okay.  The -- this flight attendant indicates
 8   that you took off your mask again and yelled, "Get on
 9   with your speech."
10       And she asked you to put your mask back on and
11   started to do the briefing, and you jumped up and yelled,
12   "Fuck, I'm taking my seat."  End quote.
13       Is that --
14       A.  I don't remember that either, sir.  I dispute
15   that all along.  I had just flown two flights.  That's
16   just -- what -- would you -- that doesn't even make
17   sense.  I'm trying to get stuck in Arizona trying to get
18   to Alaska?
19       Q.  Do you dispute, sir, generally -- well, would
20   you agree with me that generally speaking the flight
21   attendant's statements are consistent in the sense that
22   it seems that all of the crew that issued a statement
23   indicate that you were non-compliant with your mask and
24   in one manner or another being disruptive?
25       MR. WOODS:  Foundation.
```

44

```
 1       You can answer.
 2       THE WITNESS:  I don't even know how to answer
 3   that, honestly.  It -- it seems to me that, yeah, they've
 4   all sat around in a circle and talked about the best
 5   remedies to try to get through this lawsuit.
 6   BY MR. KEARNS:
 7       Q.  I'll represent to you, sir, that the dates of
 8   these -- show it to you again, Exhibit 3.
 9       The dates of these statements are created on the
10   day of August 13, 2021.
11       A.  There was a five and a half hour period that
12   they could on that flight from Arizona to Anchorage.
13       MR. WOODS:  Some of these -- I'm sorry, Sean.
14       Some of these are actually on 814.
15       MR. KEARNS:  Okay.
16   BY MR. KEARNS:
17       Q.  But you'd agree with me, sir, that you hadn't
18   filed a lawsuit yet; right?
19       A.  I'd agree with you that there was a lot of false
20   statements made on that flight to the police and there
21   was a lot of people probably trying to get their stories
22   together at that point.
23       Q.  Sir, that's -- that's not what I asked.
24       A.  I -- I don't even know what you asked.  Rephrase
25   it then.
```

45

12

Sean Bennett, 7/24/2025

### Page 46

1  Q. I asked you would agree with me that by 8-14,
2  the day after, you had not yet filed a lawsuit?
3  A. The next day, no. I was trying to get medical
4  care the next day.
5  Q. Okay. Have you seen the video that was taken as
6  you were being taken off, sir?
7  A. I think I have the one that I said, "My name is
8  master Sergeant SEAN Bennett?" That one?
9  Q. Yeah.
10 A. I have seen that. Yeah, that was -- that was me
11 trying to get off that plane and just -- I don't know --
12 feeling like I'm not trying to hurt anybody. I should
13 never had said anything. I should have just kept walking
14 completely because I made it off that plane already at
15 that point, and it was a pain enough to try to get to
16 that point. I knew I had forgot stuff, left stuff. I
17 was just annoyed at that point.
18     (Deposition Exhibit 4 was marked for
19 identification by the court reporter.)
20 BY MR. KEARNS:
21 Q. Is it your testimony, sir, that the -- that
22 prior to being asked to get off the plane, okay, so
23 before someone said we're removing you from the plane --
24 A. Okay.
25 Q. -- is it your testimony that there was no

### Page 47

1  incident, no negative interaction, no disruption, no
2  nothing like that?
3     It was just someone came up to you and said
4  we're getting you off the plane?
5  A. Somebody came up to me and said, "Move seats or
6  I'm deboarding the plane," and then I deboarded the
7  plane.
8  Q. Okay.
9  A. I've had interactions with people where I felt
10 like I had done anything that was going to have an entire
11 plane deboarded or have me in trouble with the TSA or FFA
12 or be on a No Flight List or lose houses or vehicles or
13 anything. No. Normal flight, third leg of the journey.
14 Q. So someone asks you to move seats.
15    Did you refuse to move seats?
16 A. No. I was trying to hand her my ticket, but I
17 didn't even know who she was. She didn't have any
18 identification. She was just some random lady.
19 Q. Okay.
20 A. Probably worked for the airlines, but she didn't
21 want to wear her outfit that day. I don't know. The
22 next lady -- at that point, when the next lady came up,
23 there was no move your seat. It was I'm deboarding the
24 plane, if you don't leave now. And I was already putting
25 my bag on because she was screaming coming up the aisle.

### Page 48

1  Q. Why would she be screaming?
2     How would she even know there was something
3  coming on?
4  A. Her and -- dude, you're a lawyer. Y'all figure
5  it out.
6  Q. Is it your -- I'm -- I'm going to ask this, I
7  guess, again then, sir.
8     Is it your testimony that there was no incident,
9  no disruption, nothing that led to -- in your mind,
10 nothing that led to American Airlines saying leave the
11 plane?
12 A. Nothing.
13 Q. You were just sitting there in your seat and
14 someone came up and said, "Leave the plane?"
15 A. With headphones on, with the mask and some lady
16 walk up playing Charades with the mask on. I couldn't
17 understand what she was saying, had no clue. She's
18 pointing across the aisle at me. I probably took my mask
19 off and said, I can't understand you. Can I -- can I
20 hear you? Pulling a ticket out, she turned around and
21 walked away.
22    Next lady came back screaming, I'm deboarding
23 the whole plane, I'm deboarding the whole plane, I'm
24 deboarding the whole plane. Everybody was mad at that
25 point. The little dude in the back jumped up. I was

### Page 49

1  already trying to get my bag on because she was
2  forcefully coming down the aisle. I didn't want to be
3  put in a choke point where I couldn't get around her.
4  Q. So in light of that, sir, would you agree with
5  me then that you dispute the statements and reports that
6  have been made by the captain and every other flight
7  attendant to issue a statement?
8  A. Yes, sir.
9  Q. You disagree with all of those?
10 A. The ones that you have spoken to me on this
11 right now, yes, I do.
12 Q. And each of their statements about you being
13 non-compliant with the mask, yelling about killing
14 people, things of that nature, you're -- you're disputing
15 all of that?
16    They're all -- they're all lying basically?
17    (Simultaneous crosstalk.)
18    THE WITNESS: Four years of my memory, and I
19 would say, yeah, we're -- we're -- they're lying about
20 this one.
21    MR. KEARNS: Okay.
22 BY MR. KEARNS:
23 Q. Let's go back to the other passenger, the other
24 military veteran, and I -- I don't recall whether he was
25 active duty at the time, but the -- the individual that

Sean Bennett, 7/24/2025

```
 1   you had spoken to that walked off.
 2          Do you -- you recall that?
 3      A.  I do recall that.
 4      Q.  Okay.  My understanding is -- and I can see from
 5   the video -- that it appears that he walked with you off
 6   the plane?
 7      A.  Yes, he was --
 8          (Simultaneous crosstalk.)
 9          THE WITNESS:  What's that?
10   BY MR. KEARNS:
11      Q.  I'm sorry.  At least close to being off the
12   plane.  I don't know, whether he got off or not.
13      A.  Yeah, he got off the plane.
14      Q.  Okay.  Were you able to walk on your own
15   volition?
16      A.  Yes, I was able to walk.
17      Q.  Okay.  Well, what is it -- what is your
18   understanding of what his role was walking you off the
19   plane?
20      A.  A sole -- a -- he -- he was out of the military.
21   He saw how bad it was getting back there with them
22   screaming and yelling, and he was trying to be proactive,
23   like hey, we need to get you off the plane.  Because,
24   yeah, I know.  I'm getting off.  I'm getting off.
25   Because when she came up screaming, everybody was mad
```
50

```
 1   back there.  The whole back of the plane was screaming.
 2   "You getter get off now.  You better get the hell off
 3   now."
 4          I was getting cussed out as I was trying to get
 5   around the stewardess, the stewardess that had her
 6   uniform on.  The other one was just there somewhere at
 7   some point along with five other people standing around
 8   that looked like they were just trying to find seats on
 9   the plane.
10      Q.  So he was --
11      A.  He had a seat --
12          (Simultaneous crosstalk.)
13          THE WITNESS:  What?
14   BY MR. KEARNS:
15      Q.  He was trying to help you --
16      A.  He was trying to --
17      Q.  I'm sorry.
18      A.  There wasn't going to be anybody beating me up
19   as I was trying to leave.  He saw me trying to leave the
20   plane.  That stewardess was in the way, so, I mean, he
21   was coming around.  I mean, it was almost like, hey, he's
22   trying to get off.  Let him get off.
23      Q.  Okay.
24      A.  Now, you must know and I must know and my
25   attorney must know that at this point there's about five
```
51

```
 1   cops running through the airport trying to get onto that
 2   plane, so I feel like she wasn't allowing me to leave the
 3   plane, honestly.
 4      Q.  Sir, I'm going to show you what has been
 5   produced as the video I believe you referenced.  We can
 6   take a look at it here.  Hold on.
 7          MR. KEARNS:  It's a short video.  The sound
 8   should come through on Zoom.  I -- I did share sound.
 9          (Video played.)
10          MR. KEARNS:  So, sir -- sir, I'm gonna go where
11   we can see this guy?
12          (Video played.)
13          MR. KEARNS:  Okay.  I paused the video here
14   because it shows this guy.
15   BY MR. KEARNS:
16      Q.  It looks like in sort of -- as far as I can tell
17   on the video, kind of a military green hoodie, military
18   green color hoodie, and then what looks like a camo hat
19   holding onto you?
20      A.  Yup.
21      Q.  Is that the -- is that the military guy we've
22   been discussing that got off and walked off with you?
23      A.  I think so.  It's been four years.  I don't even
24   know his name.
25      Q.  So I'm assuming you've never talked to him
```
52

```
 1   since?
 2      A.  I have not.
 3      Q.  Okay.  It looks like he's kind of moving you
 4   forward, holding you, keeping from you coming back; is
 5   that accurate?
 6      A.  No.  I would say that he was just going down the
 7   aisle.  I was leaving that airplane on my own accord,
 8   made it that far.
 9      Q.  When you got to the front of the airplane to get
10   off, right, was he still with you?
11      A.  He walked out into the little jet bridge area.
12   Gave him a hug, and I said, "Boy, that could have got
13   really bad."  And I said, "Thanks, bye."
14      Q.  Okay.  And then you walked out the jet bridge
15   area?
16      A.  Yup.  And they -- I read a statement on there,
17   too, that I'm sure you'll get to.
18      Q.  Was there any physical altercation -- physical
19   altercation --
20      A.  No.
21      Q.  -- on the plane --
22      A.  No.
23      Q.  -- before you got off?
24      A.  No.  The closest altercation that I had I was
25   trying to get around the flight attendants, and that was
```
53

14

**Page 54**

1  just trying to maneuver around them.
2      Q.  Okay.  Once on the jet bridge when -- when --
3  when this individual walked you onto the jet bridge, did
4  -- did he walk up -- I -- I -- you know, it's not always
5  an incline.  I don't know why I said walk up, but did he
6  walk down the jet bridge?
7      A.  No.  He took about three steps off the airplane,
8  and we did our little bro handshake.  And he went back on
9  the plane so he could fly home to a funeral, and I walked
10 up the jet ramp.
11     Q.  Okay.  When you walked up the jet ramp, were
12 there American Airlines personnel walking with you up the
13 jet ramp?
14     A.  No.
15     Q.  No.
16         And I'm assuming the gate door from the jet
17 bridge to the gate area was closed?
18     A.  I wouldn't assume anything considering that one
19 of your employees had said they had came down and made
20 contact with me.
21     Q.  Okay.
22     A.  So I don't know, if the door was opened or
23 closed.  Period.
24     Q.  Okay.  There was a reference to you kicking that
25 door to go back into the gate area; is that accurate?

**Page 55**

1      A.  Not me.  Didn't kick a door.
2      Q.  Okay.  When you -- let's just say the -- I -- I
3  don't know.  I don't know.  It doesn't really matter the
4  distance, but let's just say the last part.
5          After you left this guy, this military guy, and
6  walked up to the jet bridge and got into the gate, for
7  that little part of the walk and into the gate, you
8  were -- you were on your own; right?
9          You were by yourself?
10     A.  I was on the phone with my wife.
11     Q.  Okay.  But physically you were on your own?
12     A.  Yes.
13     Q.  When you got into the gate area was there anyone
14 there waiting for you, like a group of American
15 personnel?
16     A.  Nope.  No contact, anybody or anything.  Walked
17 straight through that door.  I don't even remember
18 opening the door.  I think it was already open, honestly.
19     Q.  Okay.
20     A.  I don't know.  I just -- I mean, I wish there
21 was video.  I get out there, and I turned around.  And I
22 was talking to my wife and I said, hey, get me another
23 flight for somebody else.  I don't know why I just -- but
24 I'm not flying on this one.
25     Q.  Okay.  So would it be fair -- I'm going to sort

**Page 56**

1  of summarize some of this stuff.
2          Would it be fair, sir, you testified earlier
3  that at the point that the people in the plane started
4  getting angry and --
5          MR. WOODS:  Sean, where did you go?
6          THE WITNESS:  I'm getting a water that was
7  sitting right here.
8          MR. WOODS:  Oh.
9  BY MR. KEARNS:
10     Q.  You testified earlier and I -- I took a little
11 note here just of the words, but you said you were at one
12 point -- at one point you were just trying to get off the
13 airplane; right?
14         They said they were going to deboard the whole
15 thing.  It sounds like passengers were upset about that,
16 and you at that point you were just trying to get off?
17     A.  Yes, sir.
18     Q.  Okay.  And you were able to walk in your own
19 volition ultimately off the plane.  You had a guy walking
20 with you, but you were able to walk on your own?
21     A.  Yes.  I had another military veteran that took
22 it on his own recourse to walk with me off the plane so I
23 can get off the plane or the -- you know, whatever.
24     Q.  Yeah.
25     A.  Yes.  I left on my own.

**Page 57**

1      Q.  And there was no -- there was no physical
2  altercation while on the plane?
3      A.  No, sir, or in the jet bridge.
4      Q.  And while on the plane you -- you didn't have to
5  be walked off?
6          For example, American Airlines personnel didn't
7  have to grab you and pull you off the plane?
8      A.  No, sir.
9      Q.  Did they touch you at all to get you off the
10 plane?
11     A.  No, sir.
12     Q.  When you walked into the gate area, do you
13 recall -- I'm -- I'm assuming just based on having
14 traveled that the gate area, for the most part, you know,
15 that immediate area wasn't super busy?
16     A.  It was super busy.
17     Q.  It was?  Okay.
18     A.  There was a lot of people around there.
19     Q.  Okay.
20     A.  It wasn't like two o'clock in the morning
21 flight.  There was a lot of people.
22     Q.  Now, I -- I guess I just assumed because the
23 flight was about to take off, and everyone would have
24 left that area and got on the plane, but that's fine.
25 It's neither here nor there.

Sean Bennett, 7/24/2025

--- Page 58 ---

1  My understanding from the description the
2  officers gave is that you sort of walked across to the --
3  the other side of the gate area, kind of off to the far
4  wall?
5     A.  I looked at the video screens while I was on the
6  phone with my wife so I could try to get a flight out.
7     Q.  Okay.  Yeah.  Do you recall having any
8  interaction with American Airlines personnel at the
9  little gate desk?
10    A.  The only interaction I had with anybody from
11 American Airlines out there was one of them was looking
12 at me when the cop pulled up, and I put my hands up in
13 the air and I said, "You might be looking for me."  Cause
14 I seen one cop running as hard as he could one way and
15 another one coming the other way.  One across that had
16 busted through a door, one of the emergency exits down by
17 where they come up from where the airplane is parked at,
18 but no interaction with any -- anybody on the staff.
19    Q.  Okay.  Now, we're -- I'm -- I'm going to get
20 into the rest of this incident, but I'm going to ask you,
21 sir, you -- do you recall or would you agree after this
22 whole incident, shortly thereafter, you had some e-mail
23 interactions with a guy named Bill Cooley who was an
24 investigator for American Airlines?
25    A.  Will -- William Cooley.  Yeah.  I think he

--- Page 59 ---

1  contacted me and my wife both and then the e-mail traffic
2  started back and forth.
3     Q.  Okay.  The -- I don't know.  I guess the gist of
4  it -- let me -- I'll -- I'll pull up this.
5        MR. KEARNS:  This is -- this is marked or Bates
6  stamped Bennett 00045.  Actually, I'm sorry.  It's 0043
7  through 47.  It's a little packet here, and it looks
8  like, sir, I'm going to show you this.  One second.
9  BY MR. KEARNS:
10    Q.  Can you see the -- did you see the screen
11 change, sir?
12    A.  Yes.  I had to change it, but I did.
13    Q.  Okay.  It appears that on the 17th, Tuesday the
14 17th -- these are a little out of order, so I'm going to
15 try and -- but it looks like on Tuesday the 17th
16 Mr. Cooley had reached out to you, and then you
17 responded.  This looks like 10:40 -- 10:54 in the
18 morning, and you indicated you had not been told what you
19 were accused of.
20    "I just got beat down.  I would expect a written
21 list of complaints the airport has against me.  I'm
22 requesting that as an assaulted passenger, me, that the
23 incident report be e-mailed to me for my medical doctors
24 in Alaska."
25    I'm just going through some of this.  And then

--- Page 60 ---

1  he responded here, which is what I want to ask you about.
2        He responded at 11:05 on that Tuesday
3  indicating -- asking you to call him.  I -- I'm sorry.
4  Yeah.  Asking you to call him and notes that he's an
5  employee of American Airlines and does not represent or
6  work for a law enforcement agency.
7        And then he states, "Any complaints or requests
8  that you have pertaining to reports, videos, or actions
9  by law enforcement must be directed to the Phoenix Police
10 Department."
11    Do you see that?
12    A.  I did, yes.
13    Q.  Okay.  Did you understand at least at that point
14 that if you -- if you needed complaints or materials or
15 videos or things like that, you -- you needed to talk to
16 the Phoenix Police Department?
17    A.  Yes, I did.  And I started trying to find an
18 attorney, as well as get a hold of the police.
19    Q.  Okay.  You understood from Mr. Cooley's e-mail
20 that he didn't work for the police department; that the
21 police department is separate from American Airlines?
22        You understood that?
23    A.  I didn't understand how y'all's chain of command
24 worked at all at that point.  I didn't understand who was
25 in the tower, who was making phone calls for anything.

--- Page 61 ---

1  So, no, I -- I was not a employee of American Airlines
2  or nor did I understand anything that William Cooley was
3  telling me.
4     Q.  Okay.  When you were -- when you were at the
5  gate and police officers arrived, right, and I'll ask
6  more about it, but did they arrive in uniforms?
7     A.  Yes, they did.
8     Q.  Okay.  Did they say Phoenix Police Department on
9  them?
10    A.  I really wasn't reading anything at that point.
11 I was being assaulted.
12    Q.  Okay.  Did you understand them to -- at the time
13 to be police officers?
14    A.  I understood them to be some type of -- I didn't
15 know if they were Arizona, TSA, sheriff's department.  I
16 mean, we didn't have a sit down talk.
17    Q.  Okay.  Do you understand now that they were part
18 of the Phoenix Police Department, as you sit here today?
19    A.  As I sit here today, I understand that the
20 Phoenix Maricopa County was somehow involved in all of
21 this, yes.
22    Q.  Okay.  You understand that the Phoenix Police
23 Department does not work for American Airlines?
24    A.  Okay.
25    Q.  You -- you -- you -- you don't know that?

Sean Bennett, 7/24/2025

## Page 62

1      (Simultaneous crosstalk.)
2      THE WITNESS: Makes sense to me. I mean --
3  BY MR. KEARNS:
4      Q. Okay. On this --
5      A. I'm not sure what -- what you just asked in all
6  that big round circle, but I just didn't answer anything
7  that you asked me. I just -- I agreed that American
8  Airlines doesn't get -- doesn't pay the police, unless
9  they have to probably.
10     Q. And what do you mean by unless they have to?
11     In what circumstance would --
12     (Simultaneous crosstalk.)
13     THE WITNESS: -- American Airlines.
14 BY MR. KEARNS:
15     Q. Say that again. I'm sorry.
16     A. They're security for American Airlines. They
17 can call them when they need them. Taxes or whatever, I
18 don't know. You ask them. I don't understand, and now I
19 just don't understand at all.
20     THE WITNESS: Can we take five minutes?
21     MR. KEARNS: Of course. We can take five
22 minutes. Yeah. That's perfectly fine. No problem.
23     Yeah. Well, go off the record.
24     THE VIDEOGRAPHER: We're going off the record.
25 The time is approximately 11:50 a.m. This ends media

## Page 63

1  number two.
2      (Off the record.)
3      THE VIDEOGRAPHER: We're back on the record.
4  The time is approximately 12:01 p.m. This begins media
5  number three.
6  BY MR. KEARNS:
7      Q. Okay, Mr. Bennett. We're back after a little
8  bit of a break. I was just asking about some of the
9  interactions with Mr. Cooley and American Airlines prior
10 to our break, and I'll pull up what was marked as Exhibit
11 5 again.
12     (Deposition Exhibit 5 was marked for
13 identification by the court reporter.)
14     MR. KEARNS: This is Bennett 43 and 44, and
15 here's an e-mail response from Mr. Cooley at 12:01 p.m.
16 And he states, "Mr. Bennett, you were removed for
17 disruptive behavior and not following crew member
18 instructions. The behavior included, but not limited to,
19 not wearing your mask as required upon boarding; yelling
20 "fuck, I'm taking my seat" during the flight crew
21 instructions; being confrontational with flight crew
22 members when asked multiple times to don your mask after
23 boarding; excessive cursing; and announcing to the
24 aircraft you killed important people."
25 //

## Page 64

1  BY MR. KEARNS:
2      Q. Do you see that paragraph, sir?
3      A. Let me pull it up. When I do that, I kind of
4  lose you guys.
5      Q. Oh, sure. No problem. I'll highlight it, if I
6  can here.
7      A. Yeah. I see all of it. Yeah, I read this
8  before.
9      Q. Yeah. Okay. You dispute that you did all those
10 things; is that correct, sir?
11     A. Yes. On -- I mean, what -- what Bill Cooley is
12 saying right there, yeah, William.
13     Q. Yeah. Would you agree that what William Cooley
14 is saying in the e-mail is consistent with the flight
15 attendant's statements that we went over and the
16 captain's statement?
17     A. Yeah. I -- I agree that he summed up what they
18 had said.
19     Q. Would you agree with me, sir, generally
20 speaking, that it's -- that it's, you know, not okay for
21 a passenger on board a commercial flight to yell about
22 having killed people?
23     Would you agree with me that that would be a
24 concern?
25     MR. WOODS: Form.

## Page 65

1      THE WITNESS: I believe myself that I was told
2  we will deboard the entire aircraft, so I tried to leave
3  that plane as fast as I could. That's what I know to be
4  100 percent true. Get off that plane. Goodbye.
5  BY MR. KEARNS:
6      Q. Okay. I understand that, sir, but just
7  generally speaking --
8      (Simultaneous crosstalk.)
9  BY MR. KEARNS:
10     Q. I know you -- I know you dispute it, but do you
11 believe that it -- it should be -- do you believe it's
12 okay for a passenger on a commercial airline to be
13 yelling about killing people?
14     MR. WOODS: Form.
15     THE WITNESS: My attorney saying something?
16     MR. WOODS: Yeah, just object to form.
17     You can answer.
18     MR. KEARNS: Yeah.
19     THE WITNESS: Yeah. I don't think you should be
20 harming passengers on the airplane.
21 BY MR. KEARNS:
22     Q. If a passenger is yelling about killing people,
23 you would agree with me that that's a concern for the
24 airline and the air crew?
25     A. I would say that a person that is leaving an

```
 1   airplane under duress the way -- I mean, they're leaving
 2   airplane.  Yeah.  I don't think you should be screaming
 3   on the airplane like that.  Is that what you want to
 4   hear?  There you go.
 5       Q.  Do you agree with me generally speaking that
 6   passengers on a air -- on a commercial aircraft need to
 7   comply with federal aviation regulations?
 8       A.  Yes, they do, and I did.  To the point so that
 9   when they told me they were going to deboard the plane if
10   I didn't leave, I left.  Like I took that decision on.
11   Yup, I'm out.  And that's the biggest thing that could
12   possibly happen.
13       Q.  And you wanted to leave at that point?
14       A.  No.  I wanted to get to Alaska safe.
15       Q.  Well, sure.  But you testified that once it got
16   to that point, you were trying to get off the plane?
17       A.  Once I was told that everybody else was going to
18   have to suffer, yeah, I wanted to be the -- yeah, leave.
19       Q.  Okay.  When you were in the gate area you
20   indicated that you had called your wife and were in the
21   gate area, and then you stated -- and this is consistent
22   with the reports.  You stated that you had seen officers
23   come, and you kind of -- I forget exactly what you said,
24   but you -- you kind of indicated that they were probably
25   looking for you?
```

66

```
 1       A.  Y'all looking for me.
 2       Q.  Okay.  And they saw you?
 3       A.  Yes.
 4       Q.  Okay.  The officers that approached you next, I
 5   know we just covered those, but they were in police
 6   uniforms?
 7       A.  Yes.
 8       Q.  Okay.  Did you see any American Airlines
 9   personnel around at that time?
10       A.  The one lady that was at the ticket counter that
11   I put my hands up to her and the police officers said you
12   might be looking for me because she was looking around
13   trying to figure it out, you know, and so --
14       Q.  Okay.  So it was a lady at the ticket counter.
15   She was wearing an American Airlines uniform or something
16   like.  That's -- that's who you saw?
17       A.  Yes.
18       Q.  Okay.  What was the -- have you -- have you read
19   the police officers statements?
20           Have you -- have you had a chance to review
21   those?
22       A.  Yes, I have.
23       Q.  Okay.  Do you recall -- do you recall the first
24   officer that you spoke to?
25       A.  Like verbally spoke with was Ben Denham.
```

67

```
 1       Q.  Okay.  Ben Denham.  Okay.
 2           And was he the first officer that you -- that
 3   you interacted with in anyway at the moment?
 4       A.  He was first one that hit me.
 5       Q.  Okay.  When you had raised your hands and said I
 6   think you're probably looking for me, what happened next?
 7       A.  I got bulldogged, body slammed, by one of the
 8   cops, and then the rest of them just were basically on
 9   top of me within five seconds.  Maybe ten seconds.  There
10   was five of them.  At least -- at least four, if not
11   five.
12       Q.  Okay.  So is it your testimony, sir, that there
13   was no verbal interaction, you didn't have any kind of
14   discussion or statements between you and the officers
15   before you were tackled?
16       A.  In fact, I'm pretty sure I had my mask on, too.
17   Go figure.
18       Q.  Okay.
19       A.  There was no talking and that kind of stuff.
20   They were just rushing and hitting me.
21       Q.  So you -- is it your testimony, sir, that you
22   were standing there and the cops ran up to you and just
23   tackled you?
24       A.  Yes.  The police officers did not -- hi, I'm
25   officer so and so from so and so and so and so.  We'd
```

68

```
 1   like to speak to you.  No.  I just got lifted in the air,
 2   off the wall, bounced off the wall, hit the ground, both
 3   elbows.  I've read statements.  One of the police
 4   officers said he walked up to me and, you know, it says
 5   in there somewhere we're going to have a problem.  I
 6   mean --
 7       Q.  So we'll -- we'll get to the details, but you
 8   indicated you read the statements, and I'll tell you --
 9   I'll just represent to you that all of the statements in
10   one way or the other -- I mean, the ones that have
11   relevant information -- all of them indicate that there
12   was at least some kind of discussion, at least some kind
13   of interaction, you know, talking between you and the
14   police before you were tackled.
15           Are you saying that's incorrect?
16       A.  That's incorrect.
17       Q.  Okay.
18       A.  I have my hands up in the air and said, "I think
19   you're looking for me," and that was it.
20       Q.  And then they just tackled you?
21       A.  I'd say within a few seconds I was on the
22   ground.
23       Q.  And may be the case that -- that within a few
24   seconds you were on the ground, but that's not exactly my
25   question, okay, so --
```

69

Sean Bennett, 7/24/2025

## Page 70

1  (Simultaneous crosstalk.)
2  MR. KEARNS: Let me -- let me -- hold on. Let
3  me -- let just try and describe it a little better so we
4  have a clear record; okay?
5  BY MR. KEARNS:
6  Q. Perhaps they came up with you and the
7  interaction lasted a few seconds, or whatever, and then
8  they took you down. What I want to know is if there was
9  any words -- other than you saying I'm the one you're
10  looking for, were there any words exchanged between you
11  and any officer before you were physically detained?
12  A. No.
13  Q. Is it your testimony then after reviewing the
14  police records and statements that they are all lying
15  basically?
16  A. No. They're not all lying about everything. I
17  would say that the -- if they said that they had
18  identified a problem situation with me, they walked up
19  and had a conversation about, hey, man, we just want to
20  ask you some questions. None of that. There's no --
21  none of that happened at all. I was forcefully taken
22  down with my hands in the air. I mean, that quick. They
23  were reacting to numerous assaults that they had been
24  told, and they came hot and heavy.
25  Q. How do you know what they were reacting to?

## Page 71

1  How do you know what they were told?
2  A. Hindsight's 2020. After I listened to
3  everything, I know why those cops came in. I was the one
4  behind the -- in the police car with them talking. We
5  thought you were beating the hell out of everybody.
6  Q. Okay.
7  A. Step it up.
8  Q. Exhibit 6 has been marked Bennett 098 through
9  Bennett 109. Let me pull this up for you, sir.
10  (Deposition Exhibit 6 was marked for
11  identification for the record.)
12  BY MR. KEARNS:
13  Q. This is Page 11 of the PDF. It's marked Bennett
14  108 for reference, and I believe this is Officer Denham's
15  statement, and he indicates that he approached you, and
16  you quickly stated, "Do not touch me or we're going to
17  have a problem." He responded by saying, "Calm down.
18  What is going on?"
19  "When I placed my left hand on top of his
20  shoulder while making direct eye contact with him,
21  attempting to settle him down. You were pacing around."
22  It says, "Sean pulled back and said, hey, don't
23  touch me. He was being detained for an assault
24  investigation. Sean had now taken a step inward within
25  me and was within 18 inches from his face. I could smell

## Page 72

1  the odor of alcohol emitting from his breath. He threw
2  his hands and arms upward in the air, yelling at me."
3  I'm -- I'm not -- my intent is not to read all
4  of this, but then it goes on to say, "I believe he was
5  going to become physically violent. I didn't want him
6  assaulting me or other passengers."
7  And then essentially he describes how he took
8  you down to the ground; okay?
9  Is that fair?
10  I know -- I know I kind of summarized this whole
11  paragraph, but is that generally speaking a fair reading
12  of this statement?
13  A. You're coming in broken and garbled right now.
14  Q. Oh. Can you hear me now?
15  A. I can.
16  Q. Okay.
17  A. So please state what you just said.
18  Q. Okay. I was referring to this statement on what
19  I've marked as Exhibit 6, and this is one of the -- one
20  of the police officer's statements.
21  And Mr. Officer Denham describes an initial
22  interaction when he approached you that included you
23  stating, "Don't touch me or we're going to have a
24  problem," and him -- and him responding saying, "Calm
25  down. What is going on?"

## Page 73

1  Is it your testimony, sir, that that interaction
2  did not happen?
3  MR. KEARNS: Are we -- are we stuck? I can't
4  tell what's happening.
5  (Simultaneous crosstalk.)
6  MR. KEARNS: Oh. Mr. Bennett, I -- oh.
7  MR. WOODS: I -- I think we lost him.
8  MR. KEARNS: Okay. Let's go off the record.
9  THE VIDEOGRAPHER: Okay. We're going off the
10  record. The time is approximately 12:14 p.m. This ends
11  media number three.
12  (Off the record.)
13  THE VIDEOGRAPHER: We're back on the record.
14  The time is approximately 12:20 p.m. This begins media
15  number four.
16  BY MR. KEARNS:
17  Q. Okay. Mr. Bennett, we're back after another
18  technical problem, and there may be have been some
19  questions and answers that got a little garbled while we
20  were losing the connection, so I'm just going to reask
21  it; okay?
22  I was showing what I have marked as Exhibit 6,
23  which is some statements from the police officers about
24  the incident --
25  THE VIDEOGRAPHER: We -- we lost him again.

1       MR. KEARNS:  Oh.  Now, you're back?
2       THE WITNESS:  I hear you.
3       MR. KEARNS:  Okay.
4 BY MR. KEARNS:
5   Q.  In Exhibit 6 here, this is a statement by
6 Officer Denham, and I was -- I was trying to sort of
7 summarize, read and summarize, but essentially here he
8 states right at the -- right at the middle that as he
9 approached you and identified you and you stated to him,
10 quote, "Do not touch me or we're going to have a
11 problem." And he responded by saying, "Calm down.  What
12 is going on?"
13       Right there, Mr. Bennett, are -- are you
14 disputing that statement?
15       Are you disputing that that happened?
16   A.  Yes, I am.
17   Q.  Okay.  The officer continues to discuss the
18 interaction.  And I know you've seen this before, but
19 it's all in this paragraph here that I'm kind of
20 highlighting.
21       He continues to discuss the interaction, talking
22 about trying to get you to calm down and stand still.
23 You pulling back saying, "don't touch me."
24       And -- and he states, "Sean had now taken a step
25 inward towards me and was within 18 inches from my face.

74

1 I could smell the odor of alcohol emitting from his
2 breath.  He threw his hands and arms upwards in the air,
3 yelling at me, "I didn't assault anyone, so don't touch
4 me."
5       And I'll stop right there.
6       Sir, are you claiming that that is also
7 inaccurate?
8   A.  Yes.
9   Q.  The officer stated that he believed he was
10 going -- he believed you were going to be, quote, "Become
11 physically violent.  I did not want him assaulting me or
12 other passengers who walking by us at the time." End
13 quote.
14       Do you dispute his assessment of the situation?
15   A.  I do.
16   Q.  You didn't get in the officer's face?
17   A.  No, sir.
18   Q.  When you saw them running towards you to tackle
19 you, what did you do?
20   A.  That's a good question.  Actually, I just kind
21 of tensed my entire body up and then loosened it up
22 because I knew I was about to be hammered.
23   Q.  Sir, on the beginning of this document, Page 1
24 and 2, which is -- I'll just mark -- this is Exhibit 6.
25 This is Bennett 0098.  This is a report by another

75

1 officer, Officer Cottrell.
2       Do you recall there being two officers that
3 approached you, sir?
4   A.  No.  I just remembered Denham.
5   Q.  Okay.
6   A.  The other ones were running because I saw them.
7 He just kind of surprised me and was in my face.  I mean,
8 like he was on me quick.  I didn't even know where he
9 came from.  The other ones I saw coming from left and
10 right, and then the other police officers that was with
11 the American Airlines associate at the counter, I saw
12 that one, too, but they ended up just out of nowhere.  I
13 mean, there was no confrontation.
14   Q.  This -- this officer indicated that as he
15 approached you, you appeared upset and walking towards
16 Officer Denham, who was one step ahead of him and to his
17 right.
18       And he states that, "Officer Denham put his
19 hands up as you walked right up into his face and stated,
20 "Do not touch me, or we're going to have a problem." End
21 quote.
22       Do you see that?
23   A.  Yeah, I dispute that as well.
24   Q.  It states that Officer Denham replied clear and
25 calm that he was not free to go and you were being

76

1 detained for an assault investigation, and that you
2 responded yelling, "don't touch me," raised up your arms,
3 and then he goes up to talk about how he reacted.
4       He says, "I reacted to this."
5       There's some typos to this.
6       "I reacted to this as Bennett threatening to
7 fight him, and I closed the distance and grabbed his
8 tensed up right arm by the wrist with both of my hands."
9       And then he goes on to explain going to the
10 ground.
11       Do you also dispute that aspect of the
12 statement?
13   A.  Oh, I got snatched up.  I couldn't tell you
14 about what they were thinking.  I'm not a police officer.
15 I will tell you that I had a book bag on my back
16 shoulders, so, I mean, it wasn't like I was very mobile
17 and doing everything.  You're making it sound like I was
18 having a breakdancing party.
19   Q.  Well, sir, in fairness, I'm not making it sound
20 like anything.  I -- I'm reviewing the statements by
21 these officers.  And if I understand your testimony
22 correct and confirming -- and confirm me by all means, if
23 I'm wrong, but is it your testimony that these officers
24 are lying?
25   A.  Yes.  I am saying that the officers placed their

77

**Page 138**

trying to stop me from everything.  I mean, just live in a box.  So there was no definitive from any -- any doctor about how the stroke happened either way.

Q.  Okay.  That would make my -- that would make my question correct; right?

So would it be -- would it be correct to say no physician has told you that the stroke was related to the incident in August 2021?

A.  It didn't come up.  We didn't have a conversation about August -- Friday the 13th, August 2021.  It wasn't like, hey, do you think it came from the cops or whatever.  I don't know where the stroke came from.  I'm fifty-one years old.  It could have been from three beers a day or whatever happened, the stress of being stuck in Alaska.

Q.  I -- I completely agree and understand and don't dispute that at all.

A.  Okay.

Q.  I just want to know in light of that I assume the answer is that's correct, but I just want to know has any physician told you that the stroke that you had was related to the injuries you suffered from the Phoenix police officers?

A.  No doctor has discussed that with me in that capacity that you're trying to discuss that with me now

**Page 139**

about --

Q.  Okay.

A.  No.

Q.  Sir, one of these documents identifies the -- do you recall your address, and I'm going to say it wrong.  And I said it earlier, but I said it wrong.

Is it Sevierville in Tennessee, Sevierville?

A.  Yes.

Q.  Do you remember your address there?

A.  1449 Double D Drive.

Q.  Okay.  There was another reference I'll tell you, another reference in your PT records, where it was talking about you being able -- I -- I didn't know if it was a typo, but you being able to return to cooking at work?

Let me just -- it's not all that significant, but were cooking as part of your stuff you were doing at the VA?

A.  I would do --

Q.  I'm sorry.  At the Legion?

A.  I do a grill.  We cook steaks sometimes.

Q.  Okay, okay.  That makes sense now.  I thought it was a typo when I read it in the medical record.

MR. KEARNS:  If you guys just sit tight for one minute or if you want to take a minute and run to the

**Page 140**

bathroom or something like that, I'm probably down here.  I just want to look over my notes.

MR. WOODS:  Okay.  Sounds good.

MR. KEARNS:  Are we still on the record?

THE VIDEOGRAPHER:  Yes.

MR. KEARNS:  Yeah.  Okay.  Great.  I don't have any more questions.

MR. WOODS:  Okay.  I just have -- I just have a couple of questions.

BY MR. WOODS:

Q.  Sean, you spoke with the officers after this incident?

A.  Yes, sir.

Q.  And who did you speak with?

A.  Ben Denham.  One of the -- I guess the substation, the commander came in trying to figure out what the -- what was going on, and they all spoke with me at that point.

Q.  And -- and by they all, who do you mean?

A.  All of the police officers.  La Blanc.  All of them kind of had something to say about it, you know, that it was -- it didn't seem like it was what it was -- the call was what it was supposed to be natured for, you know, an assault.  And they came in hot and heavy, and they apologized.  I mean, for the most part.

**Page 141**

Q.  They apologized to you?

A.  Yeah.  I'd call it an apology, I mean.

Q.  Did they -- did they ever tell you anything related to why they responded the way they did?

A.  Because they were told that I was assaulting people on an air craft, fighting, combative, all of key words that make the police get excited.

Q.  After the incident happened did you get on an airplane or did you have to stay in Phoenix?

A.  I stayed in Phoenix at a Motel 6 because that big rainstorm was going on and they were trying to get those flights out.  That night -- actually, if I remember exactly, they canceled movement in the airport as far as flying out, so they were in a hurry to get that plane out of there anyway.  And like I said before, there was a bunch of chaos.  There were deadheads all over the place.  And deadhead is, you know, somebody looking for a seat.

Q.  And how did you get to the hotel that night?

A.  The police brought me.  Ben brought me with his K9 dog in the back.

Q.  Did you have any other communications with the officers after -- after that?

A.  Quite a bit actually.  Ben and I texted a -- a -- for months, and then I think Nickel had sent me letters saying basically their hands were out of this.

1  That they knew it was wrong, and we were just going to
2  have to figure it out with the airlines.  So, I mean, we
3  were contacting police, everyone, trying to figure out if
4  our names were cleared out to get down to the lower 48
5  and get back to our life.
6       MR. WOODS:  don't have anything further.
7       MR. KEARNS:  Mr. Bennett, thank you for taking
8  the time today.  I know it's not the best way to spend an
9  afternoon, but I appreciate you showing up and all of
10 the -- dealing with all of the trouble, but I don't have
11 anything else.
12      MR. WOODS:  Okay.  We'll read and sign.
13      THE REPORTER:  Before we go off the record, does
14 anybody need a copy?
15      MR. KEARNS:  Well, I do, of course, but I --
16      MR. WOODS:  Yeah.  I'll take just a PDF
17 condensed.
18      THE REPORTER:  You got it.
19      THE VIDEOGRAPHER:  Okay.  This concludes the
20 video recorded deposition of Sean Bennett consisting of
21 six media units.  The time is approximately 2:14 p.m.
22 We're now off the record.
23      (Deposition proceedings concluded at 2:14 p.m.)

142

1       DECLARATION UNDER PENALTY OF PERJURY
2                      ***
3
4       I, SEAN BENNETT, the witness herein, declare
5  under penalty of perjury that I have read the foregoing
6  deposition in its entirety and that the testimony
7  contained therein, as corrected by me, is a true and
8  accurate transcription of my testimony elicited at said
9  time and place.
10
11      Dated this _____ day of _____,
12 20____, at _____, California.
13
14
15      _____
16      SEAN BENNETT

143

1       REPORTER'S CERTIFICATE
2       I, Denise Talancon, CSR No. 14047, a Certified
3  Shorthand Reporter within and for the State of
4  California, do hereby certify:
5       That, prior to being examined, the witness
6  named in the foregoing deposition solemnly stated that
7  the testimony given in this deposition would be the
8  truth, the whole truth, and nothing but the truth;
9       That said deposition was taken before me at the
10 time and place set forth and was taken down by me in
11 shorthand and thereafter reduced to computerized
12 transcription under my direction and supervision, and I
13 hereby certify the foregoing deposition is a full, true,
14 and correct transcript of my shorthand notes so taken;
15      Further, that is the foregoing pertains to the
16 original transcript of deposition in a federal case, before
17 completion of the proceedings, review of the transcript
18 [X] was [ ] was not requested.
19      I further certify that I am neither counsel
20 for, nor related to, any party to said action, nor in any
21 way interested in the outcome thereof.
22      Dated this 15th day of August,
23 2025, at Los Angeles, California.
24
         _____
25      Denise Talancon, CSR No. 14047

144