KAB

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sean Bennett, | No. CV-23-02425-PHX-ROS (DMF) |
| Plaintiff, | |
| v. | **ORDER** |
| City of Phoenix, et al., | |
| Defendants. | |

Plaintiff Sean Bennett, who is represented by counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983 and Arizona state law.  Pending before the Court is Defendant American Airlines' Motion for Summary Judgment or Alternative, Summary Adjudication (Doc. 65), which Plaintiff opposes (Doc. 72).[1]

## I.     Background

In his Complaint, Plaintiff relevantly alleged as follows. On August 13, 2021, after boarding a flight departing from Phoenix, Arizona, a woman with no identification pointed at Plaintiff and told him he needed to move to a seat across the aisle.  (Doc. 1-1 at 5-6.) Plaintiff could not hear the woman because he was wearing headphones and she was wearing a mask, and, as he started to remove his headphones, the woman "stormed off." (*Id.* at 5-6.)  Plaintiff began to look for his ticket and was approached by a woman in an

---

[1] Although Defendant requests oral argument, that request is denied because the issues are fully briefed and argument would not assist the decisional process. *See* LRCiv 7.2(f).

American Airlines uniform, who told him to leave the plane immediately. (*Id.* at 6.) Plaintiff grabbed his bag and began to put on his shoes; the flight attendant told him that if he did not get off the plane, the plane would be deboarded. (*Id.* at 6.) Plaintiff left the plane without touching anyone. (*Id.*)

An employee of American Airlines called the police and reported that Plaintiff was physically fighting with the crew and there was a police emergency. (*Id.* at 7.) The police dispatcher reported that a fight was "currently underway within the aircraft and that the police needed to 'step it up' in order to respond to the disturbance hastily." (*Id.*)

Once in the jetway, Plaintiff called his wife and leaned against wall while reviewing flight information on overhead screens. (*Id.* at 7.) Plaintiff saw former Defendants City of Phoenix police officers Cottrell, Denham, Blanc, Peru, and Hogan and "peacefully raised his arms to wave at the Officer Defendants and let them know that he might be who they were looking for." (*Id.* at 8.) Plaintiff was then tackled and bear hugged by the former Officer Defendants. (*Id.*) One officer "hit him at a high rate of speed and fell on top of him to the ground" and the other four officers spread his legs and arms and handcuffed him. (*Id.*) "They then dragged" Plaintiff "down a flight of stairs and threw him into a police car." (*Id.*) At no time did Plaintiff resist and he was bleeding and bruised with a torn rotator cuff. (*Id.*) Five minutes later, Plaintiff was pulled out of the car and chained to the floor of an airport jail cell. (*Id.*) Ten minutes later, "a captain" walked in and attempted to help Plaintiff get an immediate flight. (*Id.*) After investigating, the Defendant Officers "realized that at no time was there any physical altercation between" Plaintiff and flight staff and Plaintiff was released. (*Id.* at 9.)

Plaintiff alleged: (1) a Fourth Amendment false arrest claim against the City of Phoenix and Defendants Phoenix Police Officers Cottrell, Denham, Blanc, Peru, and Hogan (Count One); (2) a Fourth Amendment false imprisonment claim against the City of Phoenix and Defendants Phoenix Police Officers Cottrell, Denham, Blanc, Peru, and Hogan (Count Two); (3) negligence/gross negligence against all Defendants (Count Three); (4) assault against all Defendants (Count Four); (5) battery against all Defendants

(Count Five); (6) "Instigating or participating in false arrest and imprisonment" against all Defendants (Count Six); and (7) Intentional Infliction of Emotional Distress against all Defendants (Count Seven).

In an April 23, 2024 Order, the Court dismissed Plaintiff's federal claims and the Officer Defendants, and noted that the remaining claims in this action are Plaintiff's state law claims in Counts Three, Four, Five, Six, and Seven against American Airlines.  (Doc. 20.)  The federal claims were dismissed on the merits and on qualified immunity grounds. (*Id.* at 11.)  The state law claims were dismissed for failure to comply with Arizona's Notice of Claim Statute.  (*Id.* at 4.)  Defendant Denham was dismissed pursuant to Rule 25(a)(1) of the Federal Rules of Civil Procedure.  (*Id.* at 5.)  The City of Phoenix was voluntarily dismissed by Plaintiff without prejudice pursuant to Rule 41(a)(1)(A)(i).  (*See id.* at 3.)

Defendant American Airlines moves for summary judgment as to Plaintiff's remaining claims on the ground that Plaintiff's "Instigating or participating in false arrest and imprisonment" claim against all Defendants (Count Six) is barred by the applicable statute of limitations, Plaintiff's assault and battery claims are unsupported, and Defendant is entitled to immunity pursuant to 49 U.S.C. § 44941.

## II.   Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III.    Facts**

On August 13, 2021, Plaintiff boarded American Airlines Flight 2391 from Phoenix, AZ, to Anchorage, AK (Flight 2391). (Doc. 66 ¶ 1; Doc. 73 ¶ 1.)

On August 13, 2021, Audrey Weishaar was a flight attendant on American Airlines Flight 2391. (Doc. 66-1 ¶ 2.) Weishaar asserts that she was informed that Plaintiff got into a verbal altercation with the first officer prior to boarding Flight 2391. (*Id.* ¶ 3.) Weishaar asserts that she first observed Plaintiff yelling at another passenger as he traveled down the center aisle of the aircraft during boarding. (*Id.* ¶ 4.) She asserts that the other passenger had food and Plaintiff yelled about the food and threatened to steal it. (*Id.*) She asserts that shortly thereafter, she observed Plaintiff take his mask off and yell that his seat was moved from 27C to 27D, but his actual seat was 27B. (*Id.* ¶ 5.) She asserts that after Plaintiff sat, she noticed he had a dip bottle for his tobacco spit and he told her she could throw it away, so she did and instructed him to put his mask on, but he did not comply. (*Id.* ¶ 6.) Weishaar asserts that another flight attendant, Celinda Levno, approached Plaintiff and instructed him to put on his mask. (*Id.* ¶ 7.) Weishaar asserts that Plaintiff

complied while mumbling that Weishaar was mad at him and she told him she was not mad and he replied he was not mad either. (*Id.*) Weishaar asserts that as she prepared to give her safety briefing, Plaintiff took his mask off again and yelled, "get on with your speech!" (*Id.* ¶ 8.) Weishaar asserts that she asked Plaintiff to put his mask back on and she started to do the emergency exit row briefing, at which point Plaintiff jumped up and yelled, "Fuck! I'm taking my seat!" and then got in her face and said, "You're going to look at me all flight." (*Id.* ¶ 9.) Weishaar asserts that from the moment Plaintiff boarded the aircraft, he was being very loud and gave the impression of being drunk although he did not smell of alcohol. (*Id.* ¶ 10.) Weishaar asserts that she told the pilots and flight attendants that she could not fly with Plaintiff because she felt he was very aggressive and threatening, and the flight crew collectively decided that Plaintiff needed to be removed from the flight due to his non-compliance and threatening behavior. (*Id.* ¶ 11.) Weishaar asserts that a supervisor, Annette Edmond-Hodges, came onboard to assist and informed Plaintiff that he would not be flying that evening and needed to exit the aircraft and Plaintiff refused to deplane, at which point other passengers began yelling at him to get off the plane. (*Id.* ¶ 12.)

Hannah Brown, a ticketed passenger aboard Flight 2391 asserts that she boarded the flight and was wearing noise cancelling headphones and listening to music sitting in seat 28D while other passengers boarded. (Doc. 66-2 at 3.) Brown asserts that through her headphones, she heard a man shouting and saw a male passenger in Row 27 speaking to a flight attendant; she asserts that she heard the flight attendant asking the man to move out of his seat and he was angry and took off his mask and yelled that he paid for the seat and was in the military. (*Id.* ¶¶ 4-5.) Brown asserts that the man identified himself as "Master Sergeant" and yelled about his military service and being in George Bush's library, yelling at one point that he had killed people before. (*Id.* ¶ 6.) Brown asserts that although the flight attendant asked the man to exit, he refused and continued to yell and argue until another male passenger convinced him to deplane and escorted him off the aircraft. (*Id.* ¶ 7.)

Eryn Scannell, a ticketed passenger on Flight 2391, asserts that after boarding the aircraft and taking her seat, she observed a male passenger board the aircraft while chewing tobacco and spitting into a cup, pulling down his mask while doing so. (Doc. 66-3 ¶ 3.) Scannell asserts that she observed a flight attendant instruct the man to discard the cup and keep his mask on and the man appeared frustrated and spoke loudly as he sat down. (*Id.* ¶ 3.) Scannell asserts that she believed the man to be under the influence of something based on her observations of his behavior. (*Id.* ¶ 4.) Scannell asserts that she observed a flight attendant ask the man to move to the seat on the opposite side of the aisle from where he was seated, stating he needed to move for training purposes and the man complied, but needed reminders to wear his mask and fasten his seat belt. (*Id.*) Scannell asserts that she observed the man refuse a flight attendant's request to put on his seat belt, and another flight attendant told him "You have to put it on, or we cannot leave." (*Id.* ¶ 5.) Scannell asserts that she observed the man move back to his original seat shortly after the flight attendant walked away and then saw the flight attendant return and ask the man to move, at which point, the man stood up, turned toward the rear of the plane and started shouting, stating that he was Sean Bennett, he was in the military, and received a Silver Star. (*Id.* ¶ 7.) Scannell asserts that the man's behavior made her nervous and she began recording the man on her cell phone.[2] (*Id.* ¶ 8.)

Plaintiff points to his deposition testimony in apparent dispute of these accounts (Doc. 73 at 2 ¶¶ 2-6, citing Ex. 1 31:14-15, 46:25-47:24, 48:8-12, 66:8-11, 41:8-14, 40:25-41:2, 49:12-20, 53:18-24, 57:1-3, 33:11-15):

> A. I do not recall boarding last and not taking my assigned seat.
> . . . .
> Q. -- is it your testimony that there was no incident, no negative interaction, no disruption, no nothing like that? It was just someone came up to you and said we're getting you off the plane?

_____

[2] Although Scannell's declaration indicates that the video is attached, the Court could locate no such attachment in the record.

A. Somebody came up to me and said, "Move seats or I'm deboarding the plane," and then I deboarded the plane.

Q. Okay.

A. I've had interactions with people where I felt like I had done anything that was going to have an entire plane deboarded or have me in trouble with the TSA or FFA or be on a No Flight List or lose houses or vehicles or anything. No. Normal flight, third leg of the journey.

Q. So someone asks you to move seats. Did you refuse to move seats?

A. No. I was trying to hand her my ticket, but I didn't even know who she was. She didn't have any identification. She was just some random lady.

Q. Okay.

A. Probably worked for the airlines, but she didn't want to wear her outfit that day. I don't know. The next lady -- at that point, when the next lady came up, there was no move your seat. It was I'm deboarding the plane, if you don't leave now. And I was already putting my bag on because she was screaming coming up the aisle.

. . . .

Q. Is it your testimony that there was no incident, no disruption, nothing that led to -- in your mind, nothing that led to American Airlines saying leave the plane?

A. Nothing.

Q. You were just sitting there in your seat and someone came up and said, "Leave the plane?"

A. With headphones on, with the mask and some lady walk up playing Charades with the mask on. I couldn't understand what she was saying, had no clue. She's pointing across the aisle at me. I probably took my mask off and said, I can't understand you. Can I -- can I hear you? Pulling a ticket out, she turned around and walked away. Next lady came back screaming, I'm deboarding the whole plane, I'm deboarding the whole plane, I'm deboarding the whole plane. Everybody was mad at that point. The little dude in the back jumped up. I was already trying to get my bag on because she was forcefully coming down the aisle. I didn't want to be put in a choke point where I couldn't get around her.

Q. So in light of that, sir, would you agree with me then that you dispute the statements and reports that have been made by the captain and every other flight attendant to issue a statement?

A. Yes, sir.

You disagree with all of those?

A. The ones that you have spoken to me on this right now, yes, I do.

Q. And each of their statements about you being non-compliant with the mask, yelling about killing people, things of that nature, you're -- you're disputing all of that? They're all -- they're all lying basically?

THE WITNESS: Four years of my memory, and I would say, yeah, we're -- we're -- they're lying about this one

. . . .

Q. Do you agree with me generally speaking that passengers on a air -- on a commercial aircraft need[s] to comply with federal aviation regulations?

A. Yes, they do, and I did. To the point so that when they told me they were going to deboard the plane if I didn't leave, I left. Like I took that decision on. Yup, I'm out. And that's the biggest thing that could possibly happen.

. . . .

Q. The flight attendant acknowledges that you didn't specifically threaten anyone, but that you seemed to frighten a lot of passengers with your rant, which was very loud and full of obscenities. Do you disagree with that statement? Do you -- do you claim that that isn't accurate?

A. I disagree with everything at this point that you say except me trying to get off the plane.

. . . .

Q. Were you yelling obscenities at any time, any kind of swear words?

A. No. Like I don't remember cussing anybody out. I wasn't being -- I wasn't trying to get into a altercation physically with anybody, and that normally starts that when you start cussing people out, especially since I was trying to leave the plane.

. . . .

Q. Was there any physical altercation -- physical altercation –

A. No.

Q. -- on the plane –

A. No.

Q. -- before you got off?

A. No. The closest altercation that I had I was trying to get around the flight attendants, and that was 1 just trying to maneuver around them.

. . . .

Q. And there was no -- there was no physical altercation while

> on the plane?
> A. No, sir, or in the jet bridge
> . . . .
> THE WITNESS: I had my mask on probably up to the point where I was trying to get off the airplane with my headphones that I lost, a bunch of paperwork that's probably sitting on the plane still that I lost. I had my wallet, my phone, and my mask in my bag on my back. They told me to get off of an American Airlines plane, and I left as fast as I could. I don't know if you've ever had to do that, but you -- you make a business decision. Get off the plane, and that's what I did.

(Doc. 73-1 at 5, 7, 9, 10-11, 13, 15, 17, 18, 19, 22.)

The Pilot called an American Airlines Tower Gate Dispatcher and reported, "We've got a combative passenger on board[,] we need police down here A.S.A.P." (Doc. 66 ¶ 7; Doc. 73 ¶ 7.) The Tower Gate Dispatcher called Aviation Police Dispatch and said, "On board the aircraft, I'll need LEOs, I have a male passenger her[e] being combative with flight crew." (Doc. 66 ¶ 8; Doc. 73 ¶ 8.) Aviation Police Dispatch asked if the passenger was physically fighting, and the Tower Gate Dispatcher responded, "That's my understanding." (Doc. 66 ¶ 8; Doc. 73 ¶ 8.)

Plaintiff eventually left the aircraft assisted by another passenger after American Airlines told him they would have to deboard the whole plane if he did not exit. (Doc. 66 ¶ 9; Doc. 73 ¶ 9.)

Annette Edmonds-Hodge, an American Airlines Ground Situation Coordinator at the Phoenix Airport was present at Gate A20 when Plaintiff deboarded and asserts that she observed him kick open the door separating the jetway bridge and gate area at Gate A20. (Doc. 66-7 ¶¶ 1, 5.) Annette asserts that Plaintiff approached her and her colleague, Jeff Ferrari and made threatening remarks and his fists were balled up as if he were preparing to hit someone. (*Id.* ¶ 6.) Plaintiff points to his deposition testimony in dispute of Annette's statement (Doc. 73 at 2 ¶ 10, citing Ex. 1 54:24-55:1, 57:1-3):

> Q. Okay. There was a reference to you kicking that door to go back into the gate area; is that accurate?
> A. Not me. Didn't kick a door.
> . . . .

Q. And there was no -- there was no physical altercation while on the plane?

A. No, sir, or in the jet bridge.

(Doc. 73-1 at 11, 19.)

An American Airlines Gate Manager present at the gate was on the phone with an American Airlines Tower Gate Dispatcher and reported, "someone just busted out through the door. Can you get me LEO's because I got some guy that is very agitated . . . LEO's. I gotta get in front of someone. OK." (Doc. 66 ¶ 11; Doc. 73 ¶ 11.) After the American Airlines Gate Manager requested law enforcement officers to the gate area, the Tower Gate Dispatcher made a second call to Aviation Police Dispatch as follows:

**Tower Gate Dispatcher**: "Regarding Gate Alpha 20 and a combative passenger who is currently off the aircraft and in the jetway."

**Aviation Police Dispatcher**: "Are they still fighting?"

**Tower Gate Dispatcher**: "Um, I'm not sure about that. That was just an (insa?) update from the pilot and so once he was off they closed the door. But I'm trying to get. Hold on one second."

**Tower Gate Dispatcher talking to someone else the background**: "Yeah. Yeah. Is. Hold on a Second."

**Another female in background**: "Status is he in the jetway. Is he still being combative?"

**Tower Gate Dispatcher**: "Yes, he is still being combative."

**Tower Gate Dispatcher to Aviation Police Dispatch**: "Outbound flight number is 2391. And they do have him at the podium now, the gate podium, and they, please, they say please get leos's there ASAP."

**Aviation Police Dispatcher**, speaking quietly to himself or someone else while typing: "Request Status. Request to Step up."

**Aviation Police Dispatch**: Perfect. O.K. We'll go ahead and update. We'll let the officers know that they need to respond a little bit quicker.

**Tower Gate Dispatcher**: Yes, Please.

(Doc. 66-6 at 3.)

Plaintiff eventually left the gate area at Gate A-20 and walked toward the Admiral's Club across from Gate A-20. (Doc. 66 ¶ 14; Doc. 73 ¶ 14.) Police officers encountered

Plaintiff near the Admiral's Club across from Gate A-20.  (Doc. 66 ¶ 15; Doc. 73 ¶ 15.) There was a physical altercation with the police officers and Plaintiff was arrested.  (Doc. 66 ¶ 16; Doc. 73 ¶ 16.)  Law enforcement officers are trained on how to assess the situations they encounter, including a suspect's body language, reactions, and threats, and evaluate each situation in order to react appropriately.  (Doc. 66 ¶ 19; Doc. 73 ¶ 19.)  Plaintiff concedes that responding officers have an independent duty to investigate the situation prior to making an arrest.  (Doc. 66 ¶ 23.)

## IV.    Discussion

### A.    False Arrest and Imprisonment

Plaintiff concedes that his "Instigating or participating in false arrest and imprisonment" claim (Count Six) is untimely and must be dismissed.  (Doc. 72 at 11-12.)

### B.    Assault and Battery

Defendant asserts that it is entitled to summary judgment because there are no allegations or evidence that any of its employees ever touched Plaintiff or placed him in fear of imminent harm.

In Response, Plaintiff argues that "by making the reports they made to police, Defendant's employees intended to cause police officers to become animated and ready themselves for a likely physical confrontation with Plaintiff, which is exactly what the police initiated when they first encountered him, and exactly why they did so." (Doc. 72 at 10.)  Plaintiff further argues that "Defendant's employees' intentional conduct in making those statements to police dispatch . . . about Plaintiff proximately caused police officers to use physical and violent contact against him." (*Id.* at 11.)

Plaintiff does not contend that any of Defendant's employees assaulted him or committed a battery.  Rather, Plaintiff contends that by referring to Plaintiff as combative and agitated to Aviation Police and responding to a question about Plaintiff physically fighting as "that's my understanding," Defendant's employees assaulted and battered Plaintiff.  There is no evidence that any of Defendant's employees committed assault or battery against Plaintiff and Plaintiff's arguments that the employees were the "proximate

cause" of police conduct is unsupported by any evidence.

As noted in the Record, law enforcement officers are trained on how to assess the situations they encounter, including a suspect's body language, reactions, and threats, and evaluate each situation in order to react appropriately and Plaintiff concedes that responding officers have an independent duty to investigate the situation prior making an arrest. "An unforeseen and abnormal intervention" "breaks the chain of causality." *See, e.g.*, *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996). Here, it was unforeseen and abnormal that an assault and battery would occur as the result of the reports made by Defendant's employees. *See Est. of Lopez ex rel. Lopez v. Torres*, 105 F. Supp. 3d 1148, 1157–58 (S.D. Cal. 2015) (police officer's "mere act" of calling SWAT team and reporting offender's violent history could not "reasonably be anticipated to result in the use of excessive force."). For the foregoing reasons, summary judgment will be granted in favor of Defendant as to the assault and battery claims in Counts Four and Five.

## C.    Counts Three and Seven

Defendant argues that it is entitled to absolute immunity on the remainder of Plaintiff's claims under 49 U.S.C. § 44941, which immunizes airlines and employees for reporting threats to law enforcement. Defendant asserts that the exception to immunity only applies to false statements or statements made with reckless disregard as to the truth or falsity, which does not apply here.

In Response, Plaintiff asserts that none of the statements are protected because they fall under at least one exception to immunity.

### 1.    Legal Standard

> Any air carrier or . . . employee of an air carrier . . . who makes a voluntary disclosure of any suspicious transaction relevant to a possible violation of law or regulation, relating to air piracy, a threat to aircraft or passenger safety, or terrorism, as defined by section 3077 of title 18, United States Code, to any employee or agent of the Department of Transportation, the Department of Homeland Security, the Department of Justice, any Federal, State, or local law enforcement officer, or any airport or airline security officer shall not be civilly liable to

> any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision of any State, for such disclosure.
>
> [This does not apply to] any disclosure made with actual knowledge that the disclosure was false, inaccurate, or misleading; or any disclosure made with reckless disregard as to the truth or falsity of that disclosure.

49 .S.C.A. § 44941 (a)-(b)(1)(2).

### 2.    First Statement

The Pilot called an American Airlines Tower Gate Dispatcher and reported, "We've got a combative passenger on board[,] we need police down here A.S.A.P."

Plaintiff asserts that the Pilot's statement that Plaintiff was "combative" was false, inaccurate or misleading because the facts show that Plaintiff was peaceful, compliant, and non-threatening and raise an inference that the Pilot was aware of those facts at the time of this statement or was made with reckless disregard to the statement's truth or falsity.

Statements in Plaintiff's personal knowledge must be taken as true, even absent other corroborating evidence. *See Nigro v. Sears, Roebuck & Co*., 784 F.3d 495, 497 (9th Cir. 2015) (the district court cannot "disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature[,]" even if it is uncorroborated). However, vague and conclusory responses cannot create a disputed issue of material fact. *See, e.g. Carter v. Clark Cnty.*, 459 F. App'x 635, 636–37 (9th Cir. 2011) ("In support of his claims, Carter submitted only his vague, conclusory answers to Family and Child Treatment's interrogatories, and "this court has refused to find a genuine issue where the only evidence presented is uncorroborated and self-serving testimony.") (citing *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1061 (9th Cir.2002) (internal quotation marks omitted) and *FTC v. Publ'g Clearing House, Inc.,* 104 F.3d 1168, 1171 (9th Cir.1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."). Likewise, responses that indicate a lack of memory are insufficient to create a disputed issue of material fact because they demonstrate a lack of personal knowledge. *See* Fed. R. Civ. P. 56(c)(4) (sworn statement

- 13 -

used to support summary judgment motion must be made on personal knowledge); *Fed. Election Comm'n. v. Toledano*, 317 F.3d 939, 950 (9th Cir. 2002), *as amended on denial of reh'g* (Jan. 30, 2003) ("failure to remember and lack of knowledge are not sufficient to create a genuine dispute"); *cf. Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412–13 (9th Cir. 1995) (declaration on information and belief are entitled to no weight where declarant lacks personal knowledge).

As noted, Plaintiff cites only his responses in his deposition testimony to controvert Defendant's asserted facts. Much of Plaintiff's deposition testimony, however, is based on statements where Plaintiff makes sweeping generalizations without addressing specific testimony, i.e. everyone lied about everything, and answers which indicate that Plaintiff may not have a memory of everything that happened on the plane. Accordingly, Plaintiff fails to dispute much of Defendant's evidence and if Plaintiff does not dispute certain testimony, his general averments that everyone lied and he was peaceful at all times are too conclusory to create a disputed issue of material fact.

Here, two non-party witnesses aver that Plaintiff was shouting, arguing with the flight attendants, appeared angry, yelled that he paid for the seat and was in the military, identified himself as "Master Sergeant," "Sean Bennett," and stood up and faced the back of the plane and yelled about his military service, a Silver Star, and being in George Bush's library, yelling at one point that he had killed people before, refused the flight attendant's request to exit the plane and continued to yell and argue until another male passenger convinced him to deplane and escorted him off the aircraft.

On this record, there is no evidence that the Pilot's contention that Plaintiff was combative, marked by an eagerness to fight or contend,[3] and requesting immediate assistance was made with actual knowledge that the disclosure was false, inaccurate, or misleading; or was made with reckless disregard as to the truth or falsity of that disclosure. Rather, the undisputed Record evidence supports the Pilot's report. Accordingly,

---

[3] *See* Doc. 65 at 12 n.2 (citing Merriam-Webster definition of "combative").

Defendant is entitled to immunity for this statement.

### 3. Second Statement

The Tower Gate Dispatcher called Aviation Police Dispatch and said, "On board the aircraft, I'll need LEOs, I have a male passenger her[e] being combative with flight crew." (Doc. 66 ¶ 8; Doc. 73 ¶ 8.)  Aviation Police Dispatch asked if the passenger was physically fighting, and she responded, "That's my understanding." (Doc. 66 ¶ 8; Doc. 73 ¶ 8.)

Plaintiff asserts that these statements are blatantly false.  With regard to the statement "On board the aircraft, I'll need LEOs, I have a male passenger her[e] being combative with flight crew," the Court's analysis as to the First Statement applies and Defendant is entitled to immunity for the statement for the same reasons discussed above.

Plaintiff argues that Dispatch conveying that it was her "understanding" that Plaintiff was physically fighting was blatantly untrue.  Indeed, the Record does not support that Plaintiff was physically fighting and this statement was untrue to the extent it conveyed Plaintiff was fighting, although it appears that the Dispatcher's "understanding," which she conveyed was simply incorrect.  "By incorporating the actual malice standard into § 44941(b), Congress meant to give air carriers the 'breathing space' to report potential threats to security officials without fear of civil liability for a few inaptly chosen words." *Air Wisconsin Airlines Corp. v. Hoeper*, 571 U.S. 237, 249, 257 (2014) ("Denying immunity for substantially true reports, on the theory that the person making the report had not yet gathered enough information to be certain of its truth, would defeat the purpose of ATSA immunity: to ensure that air carriers and their employees do not hesitate to provide the TSA with needed information.")  Here, there is no showing that the Aviation Police Dispatcher's responding to a question of whether Plaintiff was physically fighting with "that's my understanding" was made with reckless disregard versus an actual misunderstanding of Plaintiff's behavior on the airplane.  Accordingly, Defendant is entitled to immunity for these statements.

. . . .

### 4. Third Statement

> **Tower Gate Dispatcher**: "Regarding Gate Alpha 20 and a combative passenger who is currently off the aircraft and in the jetway."
> **Aviation Police Dispatcher**: "Are the still fighting?"
> **Tower Gate Dispatcher**: "Um, I'm not sure about that. That was just an (insa?) update from the pilot and so once he was off they closed the door. But I'm trying to get. Hold on one second."
> **Tower Gate Dispatcher talking to someone else the background**: "Yeah. Yeah. Is. Hold on a Second."
> **Another female in background**: "Status is he in the jetway. Is he still being combative?"
> **Tower Gate Dispatcher**: "Yes, he is still being combative."
> **Tower Gate Dispatcher to Aviation Police Dispatch**: "Outbound flight number is 2391. And they do have him at the podium now, the gate podium, and they, please, they say please get leos's there ASAP."
> **Aviation Police Dispatcher**, speaking quietly to himself or someone else while typing: "Request Status. Request to Step up."
> **Aviation Police Dispatch**: Perfect. O.K. We'll go ahead and update. We'll let the officers know that they need to respond a little bit quicker.
> **Tower Gate Dispatcher**: Yes, Please.

Plaintiff asserts that the Tower Gate Dispatcher's statement that Plaintiff was "still being combative" was materially false, but, in his factual disputes, Plaintiff does not address with any non-conclusory evidence the testimony that when he exited the plane, Plaintiff approached American Airlines employees and made threating remarks and his fists were balled up as if he were preparing to hit someone. Accordingly, the undisputed Record supports that the Tower Gate Dispatcher's statement that Plaintiff was "still being combative" was not materially false. Moreover, there is no evidence that the Tower Gate Dispatcher's conclusion that Plaintiff was still being combative was based on a reckless disregard for the truth. Accordingly, Defendant is entitled to immunity as to these statements.

Because Plaintiff's Counts Three and Seven are based on statements for which

Defendant is entitled to immunity, summary judgment must be granted in favor of Defendant.

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is withdrawn as to Defendant's Motion for Summary Judgment (Doc. 65).

(2)    Defendant's Motion for Summary Judgment (Doc. 65) is **granted**, and the action is terminated with prejudice.  The Clerk of Court must enter judgment accordingly.

Dated this 17th day of June, 2026.

Honorable Roslyn O. Silver
Senior United States District Judge